*United States v. Churchill*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of November, two thousand nineteen.

Present:
> PIERRE N. LEVAL,
> RICHARD C. WESLEY,
> DEBRA ANN LIVINGSTON,
> *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

>    *Appellee*,

>    v.                                                                      18-2923-cr

JEREMY A. CHURCHILL,

>    *Defendant-Appellant*.

_____

| | |
|---|---|
| For Appellee: | JOHN J. BOSCIA, Assistant United States Attorney (Gregory L. Waples, Assistant United States Attorney, *on the brief*), *for* Christina E. Nolan, United States Attorney for the District of Vermont, Burlington, VT |
| For Defendant-Appellant: | DAVID L. MCCOLGIN, Assistant Federal Defender, *for* Michael L. Desautels, Federal Public Defender, District of Vermont, Burlington, VT |

Appeal from a judgment of the United States District Court for the District of Vermont (Crawford, *C.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant-Appellant Jeremy Churchill ("Churchill") appeals from a September 21, 2018 judgment in the United States District Court for the District of Vermont (Crawford, *C.J.*) following Churchill's conditional guilty plea for the possession of stolen firearms under 18 U.S.C. § 922(j). On appeal, Churchill challenges only the district court's denial of Churchill's motion to suppress evidence arising from a traffic stop by Vermont State Trooper William Phelps ("Phelps"), including the stolen firearms and incriminating statements Churchill made to law enforcement. All parties agree that the traffic stop in question exceeded the time necessary to investigate and charge Churchill with the driving offense that triggered the stop, and the only question on appeal is whether Phelps had reasonable suspicion to investigate Churchill's potential involvement in a burglary that had occurred earlier that day on Brazier Road in East Montpelier, Vermont. We otherwise assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

\*     \*     \*

When an appellant challenges a district court's ruling on a motion to suppress evidence, we review the district court's findings of fact for clear error and questions of law or mixed questions of law and fact—including whether an officer had reasonable suspicion to extend a traffic stop—*de novo*. *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018).

The Fourth Amendment permits brief investigative stops, including traffic stops, when "a law enforcement officer has a particularized and objective basis"—also known as a "reasonable

2

suspicion"—to "suspect[] the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). When, as here, a driver has been stopped based upon probable cause to believe a traffic infraction has occurred, any extension of the traffic stop beyond the point at which "tasks tied to the traffic infraction are—or reasonably should have been—completed" requires reasonable suspicion of criminal activity. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015). "In determining whether a traffic stop has reasonably been extended into an investigatory seizure, we consider whether: (1) the officer's action was justified at its inception; and (2) the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly, during which time it was necessary to detain the defendant." *Santillan*, 902 F.3d at 56–57 (citing *United States v. Foreste*, 780 F.3d 518, 526 (2d Cir. 2015)).

In making this evaluation, "[w]e view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training." *Id.* at 56. Although we recognize that trained officers may well have insights beyond those of the general public, reasonable suspicion must "derive from 'specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing.'" *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)). In other words, "reasonable suspicion" is "more than an 'inarticulate hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 22). Even so, this standard is "less demanding than probable cause," and "requir[es] only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot." *United States v. Singletary*, 798 F.3d 55, 59–60 (2d Cir. 2015) (internal quotation marks omitted).

3

Here, Phelps's decision to extend the traffic stop to investigate the burglary was "supported by numerous objective facts that, when considered in their totality, provided the requisite reasonable suspicion" that Churchill had been involved in the commission of a crime. *See id*. at 60. First, a neighbor had told Phelps that a man matching Churchill's physical description and identifying himself as "Jeremy" had been to his property—one mile down the road from the site of the burglary and eighteen miles from Churchill's residence—earlier that day.[1] Second, the man's behavior had been suspicious. After telling the neighbor that he was looking for fiddleheads, wild-growing shoots that may be picked and eaten, he proceeded farther up the residential road towards the crime scene and away from the main road, even though the neighbor told him that he could find fiddleheads down the main road. This behavior is consistent with an understanding that Churchill was knocking on doors to determine whether homes on Brazier Road were empty and susceptible to burglary. *See Santillan*, 902 F.3d at 57 ("We have long recognized that reasonable suspicion may be based, at least in part, on an implausible story, an implausible explanation of the purpose of a trip, or a story that simply does not ring true."); *see also id.* at 56 ("Conduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion where there is some indication of possible illicit activity."). Third, Phelps had previously executed a search warrant at Churchill's residence, where drug paraphernalia was recovered, and knew that Churchill had been investigated and arrested in connection with property crimes. All of this information

---

[1] The neighbor described the visitor as a "white male[,] gaunt with dark hair and a shadowy face," traveling with a woman in an "older[,] dark colored pickup truck." J.A. 39. *See Bailey*, 743 F.3d at 335 (finding reasonable suspicion where, *inter alia*, the defendant's "race, sex, build, and hair were consistent with an informant's description"). When Phelps later stopped Churchill for a traffic infraction, he was driving a pickup truck matching the neighbor's description and was accompanied by his girlfriend as well as a second man. This evidence corroborated Phelps's suspicion that the man who had driven towards the crime scene earlier that day was Churchill.

combined to justify extending the traffic stop.[2] *See United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (noting that an officer is "entitled to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available").

Moreover, the stop was carried out in a way "likely to confirm or dispel [Phelps's] suspicions quickly," and never extended beyond the scope of Phelps's reasonable suspicion. *See Santillan*, 902 F.3d at 56–57. Throughout the brief stop, Phelps asked reasonable questions rooted in evidence that he had gathered earlier that afternoon in connection with the burglary on Brazier Road. When both Churchill and his girlfriend admitted to being in the vicinity of Brazier Road at the time of the burglary, but offered conflicting accounts of their encounter with the neighbor, Phelps asked for consent to search the pickup. Unable to secure consent, Phelps properly seized the vehicle pending the issuance of a search warrant and permitted Churchill and his passengers to go. In sum, the investigatory stop at issue was justified by reasonable suspicion and conducted in a way "likely to confirm or dispel [that] suspicion[] quickly." *See id.* The district court was therefore correct to admit the evidence arising from the stop.

We have considered Churchill's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

---

[2] Phelps had previously investigated Churchill for the theft of automobile parts, and knew from other police work that Churchill was involved with drugs. Since the burglar had had gone through the homeowner's medicine cabinet, Phelps's past encounters with Churchill reasonably enhanced his suspicion that Churchill may have been involved in the burglary.